UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
──────────────────────────────── x

RAYMOND LEWIS and FREDERICK ORTIZ,
*Individually and on behalf of all others similarly situated,*

           Petitioners,

  -against-                                    23-CV-02600 (CM)

THE CITY OF NEW YORK ET AL.,

           Defendants.
──────────────────────────────── x

**MEMORANDUM ORDER DENYING APPLICATION TO FILE
DOCUMENT UNDER SEAL**

McMahon, J.:

    This lawsuit is a class action brought on behalf of a putative class of pre-trial detainees alleging that they were subject to routine strip and cavity searches at the Manhattan Criminal Courthouse without a legitimate penological interest in violation of their federal and state constitutional rights.

    At the initial pre-trial conference, the Court asked the Defendants, which include the City of New York ("City") and the City of New York Department of Correction ("DOC"), to produce the policy that is the subject of this lawsuit. The City has done so, but asks the Court to mark DEF0001 – DEF0014 (the "Directive") as confidential. Dkt #28. Plaintiffs oppose that request. Dkt #29.

    The request is DENIED. Significant portions of the Directive—including specifically the section of the Directive that explains when strip searches without body cavity searches are to be conducted—are already publicly available, per order of my colleague Judge Ramos and my retired

1

colleague Magistrate Judge Pitman, in a lawsuit entitled *Bradshaw v. the City of New York*, 15-CV-7074 (ER) (HBP), ECF No. 77 (S.D.N.Y. Aug. 10, 2018); *see* Dkt #28, Ex. B, C. So the question before the Court is not whether the entire document should be marked as confidential, but whether the Court should redact any of the Directive. Defendants offer no persuasive reason why I should do so.

### I.    **Legal Standard**

Under both common law and the First Amendment, there exists "a presumptive right of access to judicial documents[.]" *In re Search Warrant Dated Nov. 5, 2021*, No. 21MISC813ATSLC, 2021 WL 5830728, at *2 (S.D.N.Y. Dec. 7, 2021) (quoting *United States v. Erie Cnty., N.Y.*, 736 F.3d 235, 238-39 (2d Cir. 2014)). However, "[u]nder Second Circuit precedent, documents may be sealed in whole or in part where it 'is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Matthews v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 9:17-CV-503, 2023 WL 2664418, at *3 (N.D.N.Y. Mar. 28, 2023) (quoting *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006)). At common law, "[j]udicial documents are subject . . . to a potent and fundamental presumptive right of public access that predates even the U.S. Constitution." *Mirlis v. Greer*, 952 F.3d 51, 58 (2d Cir. 2020).

The Second Circuit has articulated a three-step inquiry to determine, as a matter of common law, "whether a filing may be submitted under seal or with redactions." *Monahan v. City of New York*, No. 20-CV-2610 (PKC), 2022 WL 993571, at *1 (S.D.N.Y. Mar. 30, 2022).

First, the court must determine whether the document at issue is a judicial document, meaning whether "it is 'relevant to the performance of the judicial function and useful in the judicial process.'" *Erie Cnty., N.Y.*, 763 F.3d at 239 (quoting *Lugosch*, 435 F.3d at 119).

If the document is found to be a judicial document, the court next "must 'determine the weight' of the presumption of access" that attaches to that judicial document. *Id.* (quoting *Lugosch*, 435 F.3d at 119).

Finally, the court balances any "competing considerations," such as impairment of law enforcement, judicial efficiency, or privacy concerns, against the weight of that presumption. *Lugosch*, 435 F.3d at 120. At this last step, "the court must identify all of the factors that legitimately counsel against disclosure of the judicial document, and balance those factors against the weight properly accorded the presumption of access. . . . If, at the end of this process, the balance of factors tips against permitting public access, then the court may deny disclosure." *Mirlis*, 952 F.3d at 59.

Courts must also analyze whether a First Amendment right of access attaches to the judicial document at issue. *Lugosch*, 435 F.3d at 120. To determine whether this First Amendment right attaches, the Second Circuit has articulated two approaches. *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 141 (2d Cir. 2016) (quoting *Lugosch*, 435 F.3d at 120). First, courts look to "whether 'experience and logic' support making the document available to the public." *Erie Cnty., N.Y.*, 736 F.3d at 239. That approach requires courts to consider (1) "whether the documents 'have historically been open to the press and general public' (experience)" and (2) "whether 'public access plays a significant positive role in the function of the particular process in question' (logic)." *Id.* at 239 (quoting *Lugosch*, 435 F.3d at 120). The experience factor is generally satisfied by finding a common law right to access. *Lugosch*, 435 F.3d at 120. The second approach considers the extent to which the judicial documents are "derived from or [are] a necessary corollary of the capacity to attend the relevant proceedings." *Id.* at 120 (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 93 (2d Cir. 2004)).

If a First Amendment right of access to the judicial document is found, which is a stronger protection than the common law right, the document may only be sealed or redacted if "that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Erie Cnty., N.Y.*, 736 F.3d at 239 (quoting *Lugosch*, 435 F.3d at 120).

## II. <u>Application of the Common Law Standard</u>

The first question under either inquiry is whether the document at issue, here the Directive, is a judicial document. Not all documents filed with the court are considered judicial documents. *Mirlis*, 952 F.3d at 59. The key consideration is whether the document is "relevant to the performance of the judicial function and useful in the judicial process." *Lugosch*, 435 F.3d at 119 (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d. Cir 1995) ("Amodeo I")).

This question is easily answered. This lawsuit challenged the constitutionality of aspects of the City's policy of repeatedly strip-searching inmates who are brought to court. The Directive contains the policy that is being challenged. Its contents are, therefore, relevant to the performance of judicial function and useful in the judicial process. Indeed, the judicial function could not be performed without reference to the document. Thus, the Directive is a judicial document entitled to a presumption of access—and indeed, it will inevitably become public one day, at an adjudication on the merits.

The Court must next consider the strength of the weight of the presumption that attaches to this document. "The general and deeply rooted rule is that the presumptive right of access is afforded 'strong weight' when applied to documents that play a central role in 'determining litigants' substantive rights—conduct at the heart of Article III.'" *Mirlis*, 952 F.3d at 60 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995) ("Amodeo II")). In *Monahan v. City*

4

*of New York*, No. 20-CV-2610 (PKC), 2022 WL 993571, at *2 (S.D.N.Y. Mar. 30, 2022), Judge Castel determine that the presumption of public access was strong because the plaintiffs alleged that the City and its policies were specifically responsible for violating the plaintiffs' constitutional rights. The Plaintiffs in this case similarly argue that the policies and practices of the City and DOC violate Plaintiffs' state and constitutional rights. Dkt #6 ¶¶ 75–82. Therefore, as in *Monahan*, the presumption of public access afforded the Directive, which in part outlines the specific policy and practices at issue, is strong.

After determining the weight of the presumption, the Court must consider all factors that could caution against disclosure, such as "the danger of impairing law enforcement or judicial efficiency" and the privacy concerns of the party seeking concealment and third parties. *Mirlis*, 952 F.3d at 59 (quoting *Amodeo II*, 71 F.3d at 1050). The Court then balances these factors to determine if they outweigh the presumption of access. *Id.*

Defendants assert that competing considerations outweigh the presumption of access. Specifically, they argue that "disclosing the contents of the Directive could jeopardize the safety and security of DOC facilities, staff members, persons in custody, and the public at large." Dkt #28, at 2. Plaintiffs argue that "the Directive does no such thing" and that the Directive merely "identifies the existence of a DOC policy employing strip searches during certain times at certain facilities" and "contains several pages of definitions and policy statements . . . ." Dkt #29, at 1.

In furtherance of their argument, Plaintiffs cite to the City's "Limited Secure Placement Personal Youth Search Policy," which Plaintiffs note is publicly available and provides far more detailed explanations of the City's strip search policies pertaining to detained youths. Dkt #29, at 2; N.Y.C. Admin. for Childs. Servs., Limited Secure Placement Personal Youth Search Policy #2015/09, https://www.nyc.gov/assets/acs/policies/init/2015/F.pdf. As Plaintiffs point out, the

5

descriptions of what strip searches involve in this publicly available document are similar to the definitions of strip searches in the Directive. *See* DEF0009; DEF0010. For example, both policies state that strip searches involve the detained person or youth removing their clothing and submitting to the inspection of armpits, mouths, ears, noses, navels, hair; and both explain a process by which the detainee is asked to squat to expel contraband. DEF0009; DEF0010; N.Y.C. Admin. For Childs. Servs., 9.

In support of the request to seal, Defendants point to *Bradshaw v. the City of New York*, 15-CV-7074 (ER) (HBP), ECF No. 77 (S.D.N.Y. Aug. 10, 2018). In *Bradshaw*, the City asked the court to redact portions of two DOC directives, one of which was the strip search policy now before this Court. While Judge Pitman granted the majority of the redactions because they were "either irrelevant or sufficiently sensitive" (the order does not specify which redactions were irrelevant and which were sensitive), he questioned the basis for some of those redactions, although the pages in question were not provided to this Court. *Id.* at 1. Relevant to the current motion, Judge Pitman allowed the City to redact portions of the Directive that deal with: the definition and application of strip searches without a visual cavity search; the definition, application, and logging procedures for strip searches with a visual cavity search; and the searches of newly admitted inmates. Dkt #28, Ex. C. However, Judge Pitman did not redact the information about when strip searches without a cavity search are to take place. Dkt #28, Ex. C. Despite this, the City does not now ask the Court to redact sections of the Directive, but to seal the entire policy.

In light of the above, the Directive should not be filed under seal because no competing consideration outweighs the strong presumption of public access. The Directive contains "definitions and policy statements that inform detainees of critical rights and restrictions on strip searches." Dkt #29, at 1. By Defendants' own admission, "[t]he Directive explains the policies and

procedures that DOC staff must follow when persons in custody need to be searched for contraband as well as the method by which such searches should take place." Dkt #28, Ex. A ¶ 8. The Defendants contend that release of the Directive would endanger DOC staff and facilities, but they argue in generalities. Much of what is in the Directive is already available to the public and the policy and definitions are similar to other publicly available documents.

Defendants argue that "[i]f a person in custody . . . is aware of when and how the[] contraband searches are to be conducted, such knowledge could make it easier for those individuals to bring, possess, or share contraband . . . ." *Id.* ¶ 11. This argument is unconvincing. First of all, this case challenges one particular aspect of the Directive—the practice of searching detained persons when they arrive at the courthouse for court proceedings, even though those same individuals were searched at the jail before boarding the bus and were at all times while on the bus in the custody of DOC's personnel. The City does not deny that it is policy to search pre-trial detainees before they board the bus for court, again when they arrive at the courthouse, yet again when they leave the courthouse, and a fourth time when they arrive back at the jail where they are detained. This is hardly secret from the detainees, and as Plaintiffs explain, those in custody already expect to be routinely searched. Dkt #29, at 2. There is, therefore, no basis to assert that learning about this policy would undermine security. And Defendants do not identify any specific, discernable security risk, speaking only in generalities.

Additionally, information about when Strip Searches Without a Visual Body Cavity search are to be conducted was not redacted in *Bradshaw*, and so the information relevant to this case has already been revealed to the public. Dkt #28, Ex. C.

As regards the portion of the Directive pertaining to Strip Searches With a Visual Body Cavity—which was redacted in *Bradshaw*, *id.*—Defendants provide no specifics about how the

7

release of the Directive would endanger law enforcement. Per the policy, such searches are to be conducted occur only when "Processing new admissions" (a category inapplicable to persons arriving at the courthouse from Rikers) and "When Reasonable Suspicion exists," DEF0011. Defendants do not explain how knowing that these are the standards for conducting visual body cavity searches would help an inmate avoid or frustrate such a search. A detainee cannot easily predict or avoid a correction officer's "reasonable suspicion" searches because the definition of "reasonable suspicion" is sufficiently ambiguous so that it becomes impossible to predict with any degree of certainty when such a search would take place. DEF0008(L).

Significantly, the Directive does not contain any "strategic or tactical" information about the "manner of searches, tactical methods, or the myriad other tactics used by DOC and corrections officer . . . ." Dkt #29, at 1; *Matthews*, 2023 WL 2664418, at *4. To the extent such information can be inferred, it differs not from information in similar policies that are publicly available, such as the Limited Secure Placement policy. Defendants fail to explain how the disclosure of the policy being litigated here would compromise security or endanger the public when the same information, contained in other polices, is already a matter of public record. They offer nothing more than *ipse dixit* assertions, which are not evidence sufficient to overcome the heavy presumption of public access.

### III. Application of the First Amendment Standard

Although neither Defendants nor Plaintiffs address the First Amendment right of access, it is worth touching on. As stated above, the Directive is a judicial document entitled to a presumptive right of access under both the common law and the First Amendment. The question is then

"whether 'the public and the press should receive First Amendment protection" to access the judicial document. *Lugosch*, 435 F.3d at 120.

The Directive is "best evaluated under the 'experience and logic' approach because the alternative approach is relevant only after court proceedings have commenced," which is not the case here. *Bernstein*, 814 F.3d at 141. The experience factor, whether the judicial document at issue has "historically been open to the press and general public" is satisfied by the Court's finding that the Directive is entitled to a strong presumptive right of access under the common law. *Lugosch*, 435 F.3d at 120. The logic factor considers "whether public access plays a significant positive role in the function of the particular process in question." *Hartford Courant Co.*, 380 F.3d at 92 (quoting *Press-Enter. Co. v. Superior Ct. of California for Riverside Cnty.*, 478 U.S. 1, 8 (1986)). As in *United States v. Erie Cnty., N.Y.*, which dealt with "unconstitutional conditions in Erie County correctional facilities," the question of whether the government policy at issue violates constitutional rights is "manifestly . . . of public concern and therefore . . . the public has an interest in overseeing." 763 F.3d at 242. Whether the City's strip search policy violates state and federal constitutional rights is of public concern, and the public plays a significant role in holding its government accountable for such violations. Therefore, both experience and logic support denying the request to seal the Directive. And of course as the lawsuit progresses, its contents will necessarily become public in any event.

Because I have not identified any "higher values" that "closure is essential to preserve"—nor is the request to seal the Directive narrowly tailored—the First Amendment right of access necessitates denial of the request to seal.

## CONCLUSION

For the reasons discussed above, the request to file the Directive under seal is DENIED.

Dated: December 20, 2023

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

10